Case No. 20-18-64, Samantha Newell v. Central Michigan University et al. Oral argument not to exceed 15 minutes per side. Ms. Ehlers, you may proceed for the appellant. Good morning. Ms. Ehlers, you may proceed. Good morning, Your Honor. You may proceed. May it please the Court, my name is Jordan Ehlers and I represent the plaintiff appellant, Samantha Newell, in this case. I would like to reserve three minutes for rebuttal. Very well. Your Honors, as you are well aware, this case centers on the injuries suffered by Ms. Newell during her first year as a physical therapy graduate student at Central Michigan University. Prior to being admitted to the program, Ms. Newell was assured by a defendant so mature that she could successfully complete the program despite the challenges posed by her disabilities. However, both the defendants in this case have essentially made that an impossible feat. The defendants systematically and indifferently denied Ms. Newell the accommodation she needed not only to succeed in the program, but to maintain a somewhat normal lifestyle. Due to the injuries suffered to virtually every joint in Ms. Newell's body during her first year in the program, Ms. Newell would perpetually need, among other things, wrist braces for support. She had to undergo surgery and she will continue to be in pain for years to come. Despite the pain caused by the defendants, the district court granted the defendants motion to dismiss Ms. Newell's complaint. This was an error because Ms. Newell had alleged sufficient facts to prove that defendant so mature had violated her right to bodily integrity. Defendant so mature is not entitled to qualified immunity. Ms. Newell alleged sufficient facts to find that defendant Central Michigan University constructively denied her requests for accommodations and created an abusive educational environment. The district court found that Ms. Newell's rights bodily integrity was clearly established and that she had proved sufficient facts that defendant so mature violated that. However, the district court did not find defendants so mature liable because she was entitled to qualified immunity. That's the first error that the district court committed because defendants so mature is not entitled to qualified immunity as she was deliberately indifferent. She knew of facts which presented a substantial risk of harm to Ms. Newell, specifically that the physical modalities being performed on Ms. Newell during her classes, even if performed correctly and with caution, posed a significant risk to Ms. Newell due to her genetic conditions. Council, can I, on the qualified immunity issue, you know, looking over the case law, it's hard to find a case that's particularly close to the facts of this case, right? That's one of the things we do, look to something that's clearly established. What do you think your best case is that sort of would have put this teacher, professor, administrator on notice that its conduct was violating the Constitution? We rely on Urban D. State, I believe, in our briefs. I mean, do you remember any of the facts? I mean, it's just hard to find a case that, you know, is it all like this? I mean, sometimes there's intentional conduct that's really way out of bounds, but sometimes it's not even in an educational setting. It just seemed that there was, I mean, this was a challenging, the university was trying to do some things, you're saying not enough. Your client had a lot of challenges, and I, you know, we all are very respectful of that, and the law does require certain accommodations. But it just seemed like people were mostly working in good faith to try to work this out on both sides. And so our cases just require a little bit more egregious, like, wrongful conduct.  This case was very difficult to find anything that was even sort of similar, which is probably why I'm struggling a little bit to come up with anything, just kind of off the top of my head. I believe we might have cited some in our briefs. But just kind of going back to the issue of good faith, one of the reasons that we believe that the- Well, but wait, before you- Counsel, before you move on to that, I mean, qualified immunity, it has to be clearly established that the state actor's conduct violates the Constitution. So much so that all reasonable state actors would know that their conduct violates the U.S. Constitution. And how do you establish that? Once qualified immunity is raised, the burden shifts to you to rebut the defense of qualified immunity. How have you done that? Well, Your Honor, one of the things that we focus on is the fact that defendant's self-insurer was very well aware of the facts that presented harm to my client, which any reasonable person in defendant's self-insurer's position would have known that these risks could cause substantial harm. And I don't know if that exactly answers your question, but that is what we alleged in our briefs. Okay. Moving on to kind of the purported educational value of the legalities that were being performed on my client, the educational value for someone like my client is especially low simply because of her situation. She suffers from joint laxity and joint instability, and the educational modalities that are being performed on her are supposedly being performed on her so that she will be better able to communicate how the modality is supposed to feel to her potential patients in the future. However, unless she only specializes in patients that have a similar condition to hers, she's not going to be able to tell these people what this modality is supposed to feel like. So the educational value of it being performed on her versus her just performing it on somebody else is especially low. Additionally, defendant's self-insurer is liable under the state-created danger doctrine because she increased the risk of injury to Ms. Newell as she had knowledge of Ms. Newell's condition, she knew the risks associated with it, and she still denied Ms. Newell's request for accommodations. Moving on to the defendant, Central Michigan University, there was a constructive denial of Ms. Newell's reasonable request for accommodations. The district court utilized the Edmonds test to analyze this part of Ms. Newell's claim, which has four elements, as your honors are likely very aware. The length of delay Ms. Newell first requested accommodations in January of 2017. The accommodations were not granted until July 2017 after the Office of Civil Rights became involved. During that seven-month period, Ms. Newell suffered severe and irreparable injury to virtually every joint in her body because she was expected to continue to participate in these modalities. Judge White has a question. I'd like to talk about the timeline a little. When do you claim her first request was? In January 2017, she sent an email, I believe it was to all the faculty, discussing her needs for accommodations in the physical modalities. I don't think it was a general request, but I think it was her attempting to start a dialogue about what her needs were going to be going forward since this new semester presented new challenges for her. It wasn't met with any kind of response. I know that the faculty discussed it in a faculty meeting, but Ms. Newell didn't hear back about it for weeks. And then when the university wanted to schedule a meeting with Ms. Newell, they weren't even going to discuss her request for accommodations. In fact, in the March 2017 meeting, the only reason that accommodations were even discussed was because Ms. Newell brought it up. If Ms. Newell hadn't mentioned anything, they wouldn't have had discussed it at all. But she has the burden to bring it up, right? I mean, she has to request the accommodations. So that meeting was not for accommodations, but when she brought it up, they discussed it. Correct. So when was the last time she had to suffer through one of those manipulations or any type of hands on her? I believe it was in April, at the end of her semester. And then she transitioned into her clinical rotations, which didn't require modalities to be performed on her as she was acting as the physical therapist. Okay. So the delay was from sometime as early as January to April, but maybe a little bit later, depending upon what you call the request, right? Yes, I believe so. I think I heard the beginning of your question correctly. Okay, thank you. Counsel, can I ask you on this same unreasonable delay claim? Where do you tie that? It's not a claim that we've recognized yet in our circuit. I think you point to district court cases that have done that. What in the text of the ADA do you tie that? It's not a denial. This is a constructive denial analysis. It wasn't an outright denial, it was a constructive denial because she requested the accommodations. And then there's the four factors, the length of delay, the reason for the delay, how the accommodations were provided. Yeah, I just had two questions because this is not something we've done before, if I'm understanding it correctly. And so one question was, where in the text do you find support for this type of claim you want us to recognize? And then two, I don't think you've cited other circuit courts. I don't know if other circuit courts have addressed this question and what they've done with it. You've given us some district court cases, but sometimes we look to our sister circuits. Is there a movement one way or the other on that question? I was not able to find any circuits that have addressed this question specifically, which is why we only cited to the district court cases in our briefs. So none that have either rejected it or adopted it. Just no one across the board has... Not that I was able to find it in my research, which I apologize for. That's okay. There might not be... Go ahead. Okay, I'm so sorry. I couldn't hear you. But just to kind of wrap up, as I see my time is drawing short. The last thing that we raised in our brief was the issue of the abusive educational environment, which is... I believe this is another novel issue for this court, which has been addressed by the district courts, but hasn't necessarily made it all the way up to this court. The district court utilized the phonemic test, which has two components, the subjective component and the objective component. The district court found that my client didn't meet the subjective component. However, our position is that she did because she presented sufficient evidence that the conduct of the defendants caused her sufficient psychological harm, which manifested in a diagnosis of anxiety, as well as irritable bowel syndrome. And the fact that she was physically threatened by the conduct of the defendants because she did suffer actual physical injury. And now that my time has expired, I will save the rest for rebuttal. Very good. Any further questions? All right, you'll have your three minutes rebuttal. Mr. Coffman, the appellee. Thank you, Your Honor. May it please the court, Ryan Coffman, on behalf of the appellees, Central Michigan University and Dr. Silkwood Shear. I'd like to begin, if I may, just by talking about the timeline. Between the time that Ms. Newell first requested an accommodation and before an accommodation was granted, Judge White had a question specifically about that timeline. Counsel referenced the January 5, 2017 letter that plaintiffs sent to all the faculty members. That letter did not specifically talk about manipulations, annual therapy interventions, stretches, any of the techniques that Ms. Newell was going to learn in the upcoming semester, the 2017 spring semester. Rather, that letter only related to things like video recording labs. She had an issue with noise-canceling headphones that she wanted to use. And specifically in her letter, Ms. Newell said that she was just throwing out some ideas that she wanted the faculty to consider. And the faculty did exactly that. Within 12 days at the next regular faculty department meeting, Ms. Newell's letter was discussed. It was considered. These various ideas were considered. For instance, the noise-canceling headphones. Would that be problematic in a clinical setting if she couldn't hear other practitioners or monitors or alarms that might be present? There was some consideration to allowing Ms. Newell to use what's called a bone cap conductor, which kind of creates a vibration that creates a white noise. It doesn't drown out all noise, but still kind of serves some of the same purposes. Ms. Newell had an issue with not being prepared for lab after lecture in Fort Lab. And so she was given priority registration so she could pick her own lab time and select a lab that was several hours after the lecture so that she could prepare. So that letter was taken very seriously, and all the issues in it were addressed to the best of the faculty's abilities. The only other thing that arose in January of 2017 was the email that Ms. Newell sent to Dr. Silkwood Shear. That was the same day as the faculty meeting. And it only indicated that Ms. Newell believed that a final spring test that she'd experienced in class, as demonstrated on her by her instructor, had caused her to experience a migraine and some aching pains down her legs. The email on its face does not indicate that those conditions were attributable to what she experienced in class. She merely said that she thought maybe it was related. She indicated that she would follow up with her own medical providers to see if there is some kind of connection between her disability and experiencing any kind of issue with this final spring test. But then she never did. She never presented any additional information. She didn't request an accommodation in that email. She didn't request a meeting in that email. And there was really just nothing in that email at all to put anyone on notice that she was dissatisfied with her accommodations at that point. In addition, this final spring test, as has been explained by every faculty member who was deposed in this manner, and our own expert witness, Dr. Mayer, is a very gently applied evaluation technique. There would be no way that anybody could ever believe that such a gentle technique could cause a migraine headache, even in a person with Plano's disability. So again, without any kind of additional medical follow-up to show that somehow she's the one patient in all the world who's ever experienced something like this, it didn't rise to the level of a request for an accommodation. And so, again, that email has to be viewed, I think, in the context of the entire record and not in a vacuum. And when you look at all... Counsel, can I ask you just a legal question? I'd asked your friend on the other side about this idea of an unreasonable delay and whether that's a recognized claim under the ADA. And I was just wondering, have you found any other circuits that have addressed that question? I did not see any other circuits holding that a delay in granting an accommodation is a denial or a violation of the ADA. I would say that's especially true in a case where the constructive delay or the delay doesn't lead to a denial of benefits or an exclusion for participation in a program. You know, candidly, I could envision a situation where something is delayed and a student feels like, you know, maybe she has to quit the program or something like that. I mean, we could get into a factual issue where a court, some circuit court, might find such a cause of action. But that's certainly not the facts that we have in our case. How about the claim of the hostile education environment?  I'm not seeing one under the ADA. I think that the reference in the district court decision below kind of analyzed, there was an analogy to a Title IX claim. Whether such a claim could ever potentially exist, I mean, I'm not here to say that it could not. But it certainly could not exist under the facts that we have in this case. And again, I don't see any legal support for applying some kind of test or even explaining when it might apply. Whatever that line would be, from a well-reasoned opinion at the circuit court level, we're far, far short of it. Okay. I mean, what do we do with that? What should we do with that? Should we say there is no claim or, I mean, somehow we have to analyze it. So what's your position on that? Yeah. Again, if there were to be such a claim, it would require, I suppose, something along the lines of the district court's decision in this court. In this case, the way Judge Ludington analyzed the claim. And maybe the court could assume without deciding that there was such a claim, but then go on to explain why the facts of this case would not satisfy any of the elements of such a potential claim. And I think we've got to leave it at that because I would just say that it's, you know, I would think it would be difficult for your honors to decide a case or decide something doesn't exist when the facts don't even approach where it has been applied, you know, in a lower court setting, in a district court setting, and without any support from the sister circuits. When do you think the timeline began to run? So that's a great question, Judge Widenow. I was trying to get there. The earliest possible indication, I think, in the record is that the plaintiff said during her deposition that in late February 2017, she began to express just generalized concerns to Dr. Zippel, her instructor in this course that we've been talking about. Again, that's not an indication that she asked for an accommodation, that she asked for a meeting, that she asked that the interactive process begin. It's just a general concern. That's probably not enough, but that could be the earliest possible date that I would imagine we could say is the beginning date. The realistic date is probably the mid-March email. There was an email on March 13th where there was a reference to Ms. Newell having unresolved expectations for accommodations. During her deposition, she said that related to videotaping labs. But then there was another email a few days later where she's again asking that the, or maybe it wasn't even in that March 13th email, she asked that the meeting that had been planned, the scope of the meeting be expanded to include a discussion about her accommodations. And she asked specifically that that meeting occur in two weeks, and the meeting was held in two weeks and one day after that email. So really, it's that March 13th email. It's probably the earliest time we can say that she requested a meeting or a process or something that was given to her in the exact timeline that she asked for. And then as Council conceded in April, actually the date is April 10th, is the last day Ms. Newell ever experienced any kind of anything, anyone touched her at all during her entire time in the program. I would like to point out one quick thing if I may. Council has suggested that there's no educational value to receiving both, receiving these kinds of interventions of working with a partner as labs are typically set up and both practicing it on the partner and then receiving it. That's simply not accurate, and it's not borne out by the fact that every single, and maybe not every single, but our expert witness, Dr. Mayer, who's the clinical director at the Wayne State University program, indicated, as far as she knows, every school, every physical therapy program does the teaching this way, instructs students in this manner, in that there's a lab portion where students both receive the intervention and then practice it on the other student. And that makes perfect sense. If you have two students doing that through the entire lab period, both students are engaged in the entire time. They're both practicing and they're receiving. They feel how it feels, and they feel how it is to do it on somebody else. After Ms. Newell received her accommodation for the second year of the didactic portion of the program, she largely did not do that, and she largely just observed others. And if you watch somebody do something for half the hour and then watch that student's partner do something else on the first student for another half an hour, and then the last five minutes she tries to squeeze in some practice, she's not learning to the level that the other students are. And it was borne out by the fact that she was dismissed or terminated in her first clinical rotation. That's the way the program is set up. There's two years of very intense didactic work and then a full year of clinical rotations. And frankly, Ms. Newell did not succeed in her first academic rotation, and she acknowledged during her deposition that her failures in that regard had nothing to do with her claims against Central Michigan University. It was not a Central Michigan University personnel who terminated her rotation. It was a private hospital where she was doing the rotation. And, you know, again, it is a fact that she didn't take advantage of the learning environment when it was available to her. I'd like to at least touch quickly on the due process claim. Again, there's nothing in the case law that would suggest that in this type of environment a due process violation might arise, and that does tie into the qualified immunity defense. But if you're going to frame a plaintiff's allegations, it's really that Dr. Silkwood Scheer failed to protect her plaintiff being an adult enrolled in a professional degree graduate program from suffering an accidental injury while participating in an educational activity. That's not a violation of substantive due process. That's hardly even an allegation of negligence, and certainly negligence is far, far below any threshold that we would have for a violation of substantive due process or a 1983 violation. So I think the court was very correct to decide this as a matter of qualified immunity. However, Your Honors, as we did suggest in our brief, the record was fully developed. Ms. Newell had a pending motion for summary judgment at the time that the motion on the pleadings was granted. In addition, there was a motion to exclude plaintiff's expert witness that had a lot of record materials submitted to the court. So the court could have easily, I think, just decided there was no constitutional violation and not even addressed qualified immunity. And I think in this court's discretion, the court could certainly do that as well if you chose to. I don't have a great deal more to cover. I'd like to spend my last waning seconds here answering any questions the panel might have. I realize I didn't address everything in the briefs, but to the extent I have, I would rely on the briefs. Sure. Any further questions? Judge White? Judge Wrigley? All right. Thank you for your argument, Mr. Coffman. Thank you. Ms. Eldridge, you've got three minutes rebuttal. Ailers. Ailers, I'm sorry. So I just kind of want to talk about the process that Brother Counsel mentioned a little bit and about how Ms. Newell, there's no written record necessarily of Ms. Newell requesting accommodations earlier than that March 2017 meeting. Part of the reason for that is that the defendants actually changed the interactive process after the first semester that Ms. Newell participated in the CMU program. So according to the university's written policy, all accommodation requests have to go through Student Disability Services first. However, at the end of the fall 2016 semester, Defendant Soko Chirer informed my client that she could no longer request accommodations through SDS and she needed to work with her individual professors because the Student Disability Services didn't have the specialized knowledge necessary. However, that again changed after the completion of the spring 2017 semester where my client was again directed to go through Student Disability Services. So there was a period of time where my client was attempting to work with her professors kind of informally to get these accommodations that she needed. And additionally, just addressing Brother Counsel's comments about the clinical experiences that my client had. Her first clinical rotation, my client was expected to do heavy patient lifting and she was not allowed to inform the clinical site prior to being there that she needed a lifting accommodation. This was so that the relationship that CMU had with the clinical site was not jeopardized because of her needs for accommodations. So she did fail that first clinical site because she was not able to complete her heavy patient lifting and she did not have the accommodations that she needed. However, she did participate in a second clinical site that summer semester and she was able to complete it successfully because of the accommodations that she was able to receive. She did not have to do heavy patient lifting without assistance. She was given extra time to complete her patient notes so that she could keep up with her patient files. Stuff like that. So the reason that she didn't fail that first clinical site was because she did not get her accommodations that she needed. Similar to the way that, you know, she didn't necessarily, I mean, she did excel in her first year. She received a very high grade point average. So despite counsel's arguments that she was not benefiting from this educational environment, she was learning and she did achieve a very decent and very nice GPA following the spring 2017 semester. So I would just posit to this court that the district court erred in dismissing my client's complaints and thank you for your time. Any further questions? Seeing none, thank you so much for your argument counsel. The case will be submitted and you may adjourn court.